IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 2, 2005

**STATE OF TENNESSEE v. JERRY BELL**

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 01-11775, 01-11783, 01-11784     Arthur T. Bennett, Judge**

_____

**No. W2004-01355-CCA-R3-CD  - Filed September 12, 2005**

_____

The appellant, Jerry Bell, was convicted by a jury in the Shelby County Criminal Court of two counts of aggravated robbery and one count of aggravated burglary. The appellant received a total effective sentence of twenty years incarceration in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence supporting his convictions and the sentences imposed for those convictions. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

Tony N. Brayton (on appeal), Robert Wilson Jones (on appeal), William E. Robilio (at trial), and Harry Sayle (at trial), Memphis, Tennessee, for the appellant, Jerry Bell.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

At trial, Albert L. Bailey testified that on April 27, 2001, he and his wife, Nellie V. Bailey, lived in a house located at 6700 Birch Run Lane. Mr. Bailey stated that on that day, he was eighty-seven years old and his wife was eighty-five. They were both retired. Just ten days prior, Mr. Bailey had undergone his second heart operation, and, on April 27, he was still recuperating. As a result, he could not perform certain chores. Therefore, early in the morning of April 27, Mr. Bailey's neighbor had run an "edger" in the area where the Baileys' yard met the sidewalk. At 9:00 a.m., Mr. Bailey went outside to sweep the grass clippings from the sidewalk.

Shortly thereafter, a young man, later identified as the appellant, walked up to Mr. Bailey and asked for the time. Mr. Bailey responded that he had left his watch in the house. Mr. Bailey recalled, "He had his arm, his hand under his arm and he stepped a little bit closer to me and he said 'go in the house old man, don't make me kill you.'" The appellant held a dark colored pistol in the hand underneath his arm.

Mr. Bailey stated that the appellant pointed the pistol at him as he directed Mr. Bailey into the back door of the house. They went from the carport to the patio then into the laundry room of the house. When they entered the laundry room, the appellant grabbed Mr. Bailey's arm and pressed the pistol into the back of Mr. Bailey's head, pushing him further into the house. From the laundry room, Mr. Bailey called out to his wife who was sitting in the living room reading the Bible. Mr. Bailey testified, "I alerted my wife and told her that I was being held hostage."

Mrs. Bailey got up from the chair in which she was sitting. Mr. Bailey testified that Mrs. Bailey was "alarmed and hysterical." The appellant ordered the Baileys to sit on the couch. The appellant kept telling Mr. Bailey, "[T]ake me to the money, I want the money, I know you got money." Mr. Bailey told the appellant that they did not have any money. Mr. Bailey then recalled that he had money in a cigar box that he had collected from his Sunday school class. Mr. Bailey retrieved the cigar box and gave it to the appellant. The appellant took the money, approximately sixty-five dollars in cash, and crammed it into his pocket. Mr. Bailey testified that both he and his wife were afraid during the encounter.

Mr. Bailey testified that his billfold was "laying on the bar in the little kitchenette with [his] car keys and [his] knife." The appellant took the keys and the knife, but he found no money in the billfold. After searching the billfold, the appellant pressed Mrs. Bailey as to whether she had any money. The appellant retrieved Mrs. Bailey's purse and dumped the contents on the floor. He took all of the cash that was in the purse, approximately fifteen dollars. The appellant then ripped the living room telephone off of the wall.

After the appellant had taken money from the Baileys, they heard someone come into the back door of the house. Mrs. Bailey asked who had entered the house. An unidentified man wearing a ski mask came into the living room. The man asked Mr. Bailey if he had a gun in the house. Mr. Bailey, not thinking about the shotgun in his bedroom closet, responded that he did not have a gun in the house. Mr. Bailey believed the man was interested in knowing if there was a pistol in the house. The appellant kept his gun trained on the Baileys as the other man went through the house, pulling out drawers and moving the mattresses. The appellant "was just using curse words still thinking that [the Baileys] had more money."

After discovering the shotgun, the man in the mask returned to the living room and showed the appellant the shotgun. The appellant looked at Mr. Bailey and stated, "I ought to shoot you, you lied to me." The appellant took the shotgun from the other man and asked Mr. Bailey if he wanted to hold the shotgun. Mr. Bailey said no. He explained, "They [had the] pistol in one hand and the gun in the other and if I reached a gun I figured he'd shoot me."

The appellant told the masked man to find something to use to tie the Baileys. Mr. Bailey told the men that the Baileys' granddaughter had left a jump rope in the kitchen. The appellant made Mr. Bailey go to the kitchen and get two chairs. Mr. Bailey was instructed to position the chairs so they faced one another. Mr. Bailey sat in one chair, and Mrs. Bailey sat in the other. Mr. Bailey testified that Mrs. Bailey "has osteoporosis and she begged them not to tie her arms back" because she could not move her arms behind her. Mr. Bailey recalled, "My feet was tied together. We wasn't – wasn't tied to the chair, we was just tied together and our hands tied together."

The appellant and the masked man left the house through the back door. As soon as the Baileys heard the men start the Baileys' car and leave, they began trying to free themselves from their bonds. Mr. Bailey was able to untie Mrs. Bailey, and she in turn untied him. The Baileys called police to report the crimes. The perpetrators took Mr. Bailey's knife collection, coin collection, shotgun, sixty-five dollars from Mr. Bailey's Sunday school collection, and two of Mr. Bailey's rings. They also took several items of Mrs. Bailey's jewelry, including some sentimental pieces, fifteen dollars from Mrs. Bailey's purse, a telephone and answering machine, and the Baileys' car. Mr. Bailey opined that the ordeal lasted approximately forty-five minutes.

Officer James Rudd of the Memphis Police Department testified at trial that he was dispatched to the Baileys' home on April 27, 2001, to investigate a home invasion or robbery call. Mrs. Bailey met Officer Rudd at the door, saying that they had just been robbed. After ascertaining that the Baileys did not need medical assistance, Officer Rudd walked through the Baileys' house. He discovered that it was "ransacked" and "in disarray." He recalled that papers were everywhere, drawers had been pulled out, and furniture had been over turned.

Officer Patricia Turnmire with the crime scene unit of the Memphis Police Department testified that she was dispatched to the Baileys' residence to process the scene. She observed that the furniture in the house had been disturbed, drawers had been pulled out and rifled through, and mattresses had been pulled from the beds. She found a jewelry box and several smaller boxes discarded on one of the beds. Although Officer Turnmire tested several objects for viable fingerprints, she found none.

Sergeant Mark Moore testified that on May 17, 2001, he went to 6215 Village Park to locate a suspect. The appellant was found hiding in a bedroom closet in the house, and he was taken into custody. Thereafter, on May 22, 2001, Sergeant Moore spoke with the appellant. The appellant wanted to give a statement. After being apprised of his Miranda rights, the appellant gave a signed statement, implicating his involvement in the Bailey robbery. Sergeant Moore recalled that the appellant was "very cooperative."

In his statement, the appellant admitted his participation in the robbery of Albert Bailey at 6700 Birch Run Lane on April 27, 2001, at or about 9:30 a.m. The appellant stated that he was armed with "my 45" at the time of the robbery. He claimed that Sterling Barrett also participated in the robbery. The appellant acknowledged that he and Barrett took the Baileys' car, a shotgun, some jewelry, and about thirty dollars.

Sergeant Moore had the appellant to describe the events of April 27, 2001. The appellant stated:

> I was walking in the neighborhood and I saw him [Mr. Bailey] outside by the curb. I walked up to him and asked him what time it was. He was walking toward the house while we were talking. I pulled the gun on him when we got close to the garage. We finished walking into the house. Then I asked him who else was in the house and he said his wife. I waited a while and sat both of them down on the couch. I two way'd (two way pager) Sterling and told him that I was ready. Sterling came in the house and tied them up. Then I sat down on the couch and he searched the house. He said he found a [shotgun] and he brought it in the den. Then I told him to sit down [so] I could look. So we took their telephones and we got their car keys and left.

The appellant told Sergeant Moore that the gun which police found in the shed behind the house at 6215 Village Park was the same gun that he took from the Baileys.

Sergeant Matt Pugh with the Memphis Police Department testified that on May 19, 2001, he received a call from Mr. Bailey. Mr. Bailey had seen the appellant's picture in the newspaper and recognized him as the man who had held the gun on him and his wife. Based upon Mr. Bailey's telephone call, Sergeant Pugh prepared a six person photographic array. He took the array to the Baileys' home. Mr. Bailey "immediately" identified the appellant as the perpetrator with the gun.

Officer Timothy Wayne Cooper with the crime scene unit of the Memphis Police Department testified that on May 7, 2001, he was dispatched to a residence at 6215 Village Park. A storage shed was located behind the residence. While searching the shed, Officer Cooper discovered a shotgun in the ceiling panels of the shed. Mr. Bailey later identified the shotgun as the one taken from him.

The appellant presented no proof at trial.

Based upon the foregoing, the jury found the appellant guilty of the aggravated burglary of the Baileys' home, the aggravated robbery of Mr. Bailey, and the aggravated robbery of Mrs. Bailey. At the sentencing hearing, the trial court found that the appellant was a Range I standard offender. The trial court imposed a sentence of ten years incarceration for each of the aggravated robbery convictions and a sentence of five years for the aggravated burglary conviction. The aggravated robbery sentences were to be served consecutively to each other, with the aggravated burglary conviction to be served concurrently with the aggravated robbery sentences, for a total effective sentence of twenty years. On appeal, the appellant challenges the sufficiency of the evidence supporting his convictions and the sentences imposed by the trial court.

## II. Analysis

A.  Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.  State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).  In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts.  State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

We will begin by analyzing the appellant's conviction for the aggravated robbery of Mr. Bailey and the aggravated robbery of Mrs. Bailey.  Aggravated robbery is defined as robbery accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon.  Tenn. Code Ann. § 39-13-402(a)(1) (1997).  Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."  Tenn. Code Ann. § 39-13-401(a) (1997).  "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent."  Tenn. Code Ann. § 39-14-103 (1997).

Mr. Bailey testified that the appellant approached him as he was working in his yard and asked for the time.  After Mr. Bailey was unable to answer the appellant's question, the appellant drew a pistol on Mr. Bailey.  The appellant then led Mr. Bailey at gunpoint into his house.  Mrs. Bailey was in the living room reading a Bible.  The appellant, holding the weapon on the Baileys, instructed them to sit on the couch and demanded money.  He and his accomplice took money and property from both Mr. and Mrs. Bailey.  The appellant also took a shotgun belonging to Mr. Bailey. The perpetrators left Mr. and Mrs. Bailey tied up as they absconded with the Baileys' car.  Mr. Bailey asserted that both he and Mrs. Bailey were afraid during the encounter.  Mr. Bailey's shotgun was found in a shed behind the house in which the appellant was arrested.  Additionally, the appellant's confession corresponds with Mr. Bailey's testimony.  We conclude that the foregoing evidence amply establishes the appellant's guilt of the aggravated robberies of the Baileys.

In order to sustain the appellant's conviction for aggravated burglary, the State was required to prove that the appellant entered the Baileys' residence without the effective consent of the property owner with the intent to commit a theft.  Tenn. Code Ann. §§ 39-14-401(1)(A), -402(a)(1), and -403(a) (1997).  The evidence clearly establishes that the appellant entered the Baileys' home without their effective consent.  Specifically, Mr. Bailey testified that he did not want the appellant to come into the house and take their property.  As the appellant entered the Baileys' home, he

immediately began demanding money. He proceeded to take cash and property belonging to the Baileys, again without their consent. Accordingly, we conclude that the evidence is more than sufficient to establish the appellant's guilt of aggravated burglary.

## B. Sentencing

On appeal, the appellant challenges the length of the sentences imposed by the trial court. Specifically, the appellant argues that the trial court incorrectly applied several enhancement factors. Appellate review of the length, range or manner of service of a sentence is de novo. Tenn. Code Ann. § 40-35-401(d) (2003). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210 (2003); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentences. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

At the time the appellant was sentenced, the statute provided that to determine the correct length of a sentence, the trial court was to begin at the presumptive minimum, then the trial court would "enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence as appropriate for the mitigating factors." Tenn. Code Ann. § 40-35-210(e). The presumptive sentence for a Class B and a Class C felony is the minimum sentence within the appropriate range. Tenn. Code Ann. § 40-35-210(c). The appellant was sentenced as a Range I standard offender. Accordingly, the presumptive sentence for the appellant's Class B felony convictions was eight years and the presumptive sentence for his Class C felony conviction was three years. Tenn. Code Ann. § 40-35-112(a)(2) and (3) (2003).

At the sentencing hearing, Mr. Bailey testified:

> As a victim of a robbery, my wife and I were afraid to go outside in our yard. Being elderly retired people, our home that we had lived in for 18 years meant a lot to us. We had a beautiful home and lawn. We enjoyed working in the yard and tending to our flowers. After we were robbed, we did not feel safe in our home. We were forced to [sell] our home and move in with our daughter. Many items that were stolen were things that meant a great deal to my wife and I and could not be replaced. I had a stroke due to the stress that was brought on by the robbery. This was something that we will never forget and hope never happens again. This has been an

emotional and life-style change for us. We feel like that we were forced to change our life because of this.

At the conclusion of the sentencing hearing, the trial court found the existence of the following enhancement factors:

(2) The [appellant] has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

(3) The [appellant] was a leader in the commission of an offense involving two (2) or more criminal actors;

(5) A victim of the offense was particularly vulnerable because of age or physical or mental disability . . . ;

(6) The [appellant] treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;

(7) The personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great;

(14) The felony was committed while on any of the following forms of release status if such release is from a prior felony conviction:

(A) Bail, if the [appellant] is ultimately convicted of such prior felony;

(21) The [appellant] was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult.

Tenn. Code Ann. § 40-35-114(2), (3), (5), (6), (7), (14)(A), and (21) (2003). The trial court enhanced each of the appellant's sentences by two years, imposing a ten-year sentence for each aggravated robbery conviction and a five-year sentence for his aggravated burglary conviction. On appeal, the appellant argues that the trial court erred in applying enhancement factors (3), (5), and (7).

Initially, we note that the appellant does not contest the application of enhancement factors (2), (6), (14)(A), and (21). We conclude that the record contains sufficient evidence for the application of these enhancement factors.

Regarding the application of enhancement factor (3), we note that "[o]ur cases have established that enhancement for being a leader in the commission of an offense does not require that the [appellant] be the sole leader but only that he be 'a' leader." State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). The proof at trial revealed that the appellant held the Baileys at gunpoint throughout the entire ordeal, including while his cohort ransacked their house. The appellant admitted that he "two way'd" his accomplice to invite him to enter the house. Moreover, the appellant directed the accomplice to find something with which to bind the Baileys. We conclude that there was ample evidence supporting the application of this enhancement factor to each of the appellant's crimes.

The appellant also challenges the applicability of enhancement factor (5), that the victims were particularly vulnerable due to their age. See Tenn. Code Ann. § 40-35-114(5). The evidence adduced at trial and at the sentencing hearing reveals that Mr. Bailey was eighty-seven years old at the time of offenses. He had undergone his second heart surgery just ten days prior to the offenses. Because he was not strong enough to cut the grass at the edge of his yard on the morning of these offenses, his neighbor did it for him. Mrs. Bailey was eighty-five years old at the time of the offenses. She begged the appellant not to bind her hands behind her back because her osteoporosis made it impossible for her to draw her arms behind her. Further, the record reveals that the Baileys' granddaughter frequently came to the residence to check on the status of her elderly grandparents. We conclude that this evidence supports the application of this enhancement factor to each of the appellant's convictions. See State v. Dean, 76 S.W.3d 352, 378-79 (Tenn. Crim. App. 2001).

The appellant also challenges the application of enhancement factor (7), that "[t]he personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great." Tenn. Code Ann. § 40-35-114(7). The trial court applied this enhancement factor based upon the damage that resulted when the appellant and his accomplice ransacked the Baileys' house. Moreover, the State concedes that there is no evidence in the record to support that the amount of property damage sustained by the victims were particularly great. Based upon our review, we conclude that the record does not support the application of this enhancement factor on this basis. However, we conclude that this enhancement factor is appropriate based upon the great personal injuries suffered by the Baileys as a result of the offenses. This court has previously "construed the legislative intent in the term 'personal injuries' as broad enough to include not only physical harm, but also severe emotional injuries and psychological scarring." State v. Williams, 920 S.W.2d 247, 259 (Tenn. Crim. App. 1995) (citing State v. Smith, 891 S.W.2d 922, 930 (Tenn. Crim. App. 1994)). For example, this enhancement factor has been applied when a victim "suffered depression, anxiety, and other emotional problems . . . however, the record must indicate that [the victim's] psychological injuries were particularly great before factor [(7)] can be applied." Id.

In the instant case, Mr. Bailey testified that before the crimes, he and his wife frequently enjoyed being in the yard of the home they had owned for eighteen years. After the crimes, the Baileys were afraid to go into their yard. They became so afraid that they were forced to sell their home and move in with their daughter. Mr. Bailey categorized the impact of the crimes as an "emotional and life-style change" for him and his wife. Additionally, Mr. Bailey suffered a stroke

as a result of the stress of the offenses. We conclude that this proof supports the application of enhancement factor (7). Accordingly, we conclude that the trial court did not err in sentencing the appellant to ten years for each of his aggravated robbery convictions and to five years for his aggravated burglary conviction.

The appellant asserts that as a result of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), the trial court should not have acted as fact finder in determining the application of enhancement factors or the imposition of consecutive sentencing.

In Blakely, the Supreme Court explained that the "'statutory maximum' for Apprendi[v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000)] purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" Blakely, 542 at __, 124 S. Ct. at 2537. Immediately after Blakely was released, this court maintained that Blakely "calls into question the continuing validity of our current sentencing scheme." State v. Julius E. Smith, No. E2003-01059-CCA-R3-CD, 2004 WL 1606998, at *4 (Tenn. Crim. App. at Knoxville, July 19, 2004). However, in State v. Gomez, 163 S.W.3d 632, 661 (Tenn. 2005), a majority of our supreme court recently found that, unlike the sentencing scheme discussed in Blakely, "Tennessee's sentencing structure does not violate the Sixth Amendment." Accordingly, we must conclude that the trial court did not err in failing to submit the enhancement factors to the jury for their determination. Moreover, this court has previously determined that Blakely does not impact Tennessee's consecutive sentencing scheme. See State v. Earice Roberts, No. W2003-02668-CCA-R3-CD, 2004 WL 2715316, at *12 (Tenn. Crim. App. at Jackson, Nov. 23, 2004), perm. to appeal denied, (Tenn. 2005). The appellant is not entitled to relief on this issue.

### III. Conclusion

Finding no reversible error, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE